**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MORGAN STANLEY SMITH BARNEY LLC,

Plaintiff,

v.

KEVIN WHITEHEAD,

Defendant.

Case No. 10 CIV 2830 (PAC)

ECF Case

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

**GEHRING & SATRIALE LLC**
370 Lexington Avenue, Suite 1200
New York, New York 10017
Attorneys for Plaintiff

## INTRODUCTION

Morgan Stanley Smith Barney LLC. ("MSSB") respectfully submits this Memorandum of Law in support of its motion for a temporary and preliminary injunctive relief against Kevin Whitehead ("Whitehead"). As set forth below, MSSB clearly is entitled to injunctive relief enforcing its contract and other rights.

## STATEMENT OF FACTS

Whitehead was the Complex Manager for MSSB in the St. Louis, Missouri area. Whitehead was also an Executive Director since December 2003. Prior to his resignation, Whitehead supervised no fewer than 6 branch offices in the St. Louis area with a total of over 100 financial advisors servicing MSSB clients with billions of dollars under management. In performing his job, Whitehead was given access on a daily basis to highly sensitive information concerning MSSB's business and clients.

In addition, as Complex Manager and Executive Director, Whitehead was responsible for business development and for recruiting, hiring, and training brokers in the St. Louis area. Accordingly, Whitehead was privy to extremely sensitive broker information including without limitation the commissions, production, and revenue generated by each broker in the office, as well as their client base.

On March 29, 2010, Whitehead tendered his resignation to MSSB and immediately began work at a competitor, Wells Fargo. This was a direct and clear violation of a 60-day "garden-leave" agreement that Whitehead had entered into with MSSB.

In connection with his employment at MSSB and in connection with becoming eligible to receive equity awards, Whitehead agreed to provide MSSB with 60 days notice prior to his termination of employment. Paragraph A of his Agreement provides that "[y]ou agree that in the event you decide to resign your employment for any reason (a "Resignation"), you will provide

advance written notice of your Resignation to your immediate manager, and that the period of notice that you will provide shall be determined by your officer level at the time of your Resignation. . . ." Because Whitehead was an Executive Director at the time of his resignation, he was required to provide MSSB with 60 days advance notice of his resignation. See Exhibit "A" to the Complaint (para. A).

Whitehead's agreement is very clear in that "[d]uring the Notice Period . . ., you will remain an employee of MSSB and will continue to be paid your base salary and be eligible for welfare and qualified retirement plan benefits applicable to you," and that "[a]s an employee during the Notice Period, you will be expected to undertake such duties and responsibilities as are assigned to you by MSSB. . . ." See Exhibit "A" to the Complaint (para. A).

In his agreement, Whitehead also agreed not to hire or recruit MSSB employees for a six month period after his termination of employment, and he further agreed not to solicit MSSB clients for a period of 90 days after the termination of his employment. Whitehead further agreed to abide by all confidentiality obligations set forth in MSSB's Code of Conduct. See Exhibit "A" to the Complaint (paras. B, C, D).

Whitehead also agreed in his agreement that "if you do not comply or threaten not to comply with the Terms and Conditions, damages will not be an adequate remedy for any breach committed by you and, therefore, MSSB will be entitled to injunctive relief or specific performance in a state or federal court in the County of New York to the fullest extent permissible by law." See Exhibit "A" to the Complaint.

On Monday, March 29, 2010, Whitehead resigned without any advance notice and immediately joined a competing firm, Wells Fargo. His resignation letter (dated March 28, 2010) states: "Please be advised that I am resigning my position with Morgan Stanley Smith Barney LLC effective immediately. I have decided to accept a position with Wells Fargo

Advisors. . . ." See Exhibit "B" to the Complaint (emphasis added). Whitehead lists the office address in which he will be working and his new telephone number and states that "I can be reached during business hours through my new office. . . ." See Exhibit "B" to the Complaint (emphasis added).

On the same day of Whitehead's resignation and after receiving his resignation letter, counsel for MSSB sent to Whitehead by overnight delivery a letter enclosing his agreement and reminding him of his notice obligations and other obligations. See Exhibit "C" to the Complaint. Whitehead did not respond. In fact, entirely consistent with Whitehead's resignation letter, Whitehead continues to work at Wells Fargo. See Accompanying Declaration.

Moreover, on the same day of Whitehead's resignation, Reuters reported on his resignation and noted that "[i]n his new role, Whitehead will oversea 13 branches in Wells Fargo's headquarter St. Louis market." In addition, MSSB just today received a call from Wells Fargo asking that MSSB "clear" Whitehead's securities license, further indicating that Whitehead is now working at Wells Fargo.

In sum, the relevant facts are undisputed. MSSB provided Whitehead with valuable consideration. In return, Whitehead agreed to very reasonable covenants. Whitehead clearly intends to violate these covenants and to inflict irreparable harm on MSSB. Therefore, it is critical that injunctive relief be granted.

## ARGUMENT

### A. MSSB IS ENTITLED TO TEMPORARY INJUNCTIVE RELIEF

It is well settled that a district court has "broad discretion" in granting interim injunctive relief if a movant can establish "both possible irreparable injury and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make a fair ground for litigation and a balance of hardships tipping in the movant's favor." *See Charles of*

*the Ritz Group, Ltd. V. Quality King Distrib.*, 832 F.2d 1317, 1320 (2d Cir. 1987); *Ecolab, Inc. v. K.P. Laundry Machinery, Inc.*, 656 F. Supp. 894, 899 (S.D.N.Y. 1987). Morgan Stanley clearly meets these requirements.

**1. MSSB Has a Likelihood of Success On the Merits**

**A) Whitehead's 60-Day Notice Obligation is Fully Enforceable**

Whitehead is unquestionably bound by the 60-day notice provision contained in his Agreement. In fact, his Agreement states: "[Y]our eligibility for any Equity Award, whether in fiscal year 2005 or granted at any time in the future, <u>is conditioned upon your agreement to the terms and conditions of this Agreement, including those set forth in paragraphs A-D</u>. . . ." <u>See</u> Exhibit "A" to the Complaint (emphasis added).

It is undisputed that MSSB gave Whitehead very significant consideration in exchange for his notice and other covenants. Since the vast majority of employees voluntarily honor their notice ("garden leave") obligations, few New York courts have had the opportunity to enforce these provisions through injunctions.[1] In those few cases where employees refuse to honor their notice obligations, however, New York courts have steadfastly enforced them. *See, e.g, Natsource LLC v. Nunzio Paribello*, 151 F. Supp.2d 465, 470 (S.D.N.Y. 2001).[2]

Further, it is undisputed that the merits of this dispute will be arbitrated before the Financial Industry Regulatory Authority ("FINRA"). In that regard, just recently, a panel of FINRA arbitrators upheld the 60 day notice provision of a securities firm against a former financial advisor who, like Whitehead here, left for and immediately began working at Wells

---

[1] Whitehead's agreement provides for the application of New York law.

[2] *Cf. Lumex, Inc. v. Highsmith & Life Fitness*, 919 F. Supp. 624, 634 (E.D.N.Y. 1996) (enforcing six-month restrictive covenant that required the employer to pay the former employee full compensation and health and life insurance premiums during the non-competition period); *Maltby v. Harlow Meyer Savage Inc.*, 166 Misc.2d 481 (Sup. Ct. N.Y. 1995) (enforcing a six-month non-competition agreement that provided for the employer to pay the former employee during the six months in which he could not compete).

Fargo. *AllianceBernstein L.P. v. Said*, FINRA No. 10-00758. See Exhibit **"A"** hereto.

Simply put, MSSB gave Whitehead valuable consideration in exchange for his covenant to provide the company with 60 days notice of his resignation. Whitehead willingly accepted this consideration and should be required to honor his notice obligations.

### B) Whitehead's Remaining Post-Termination Covenants Also Are Enforceable

Whitehead's promise not to solicit or hire MSSB employees for a limited timeframe, his promise not to solicit MSSB clients, and his promise to maintain the confidentiality of MSSB information, also are clearly enforceable. New York courts vigorously protect employers' confidential and trade secret information. *See, e.g., Ashland Management Inc. v. Altair Investments NA, LLC, et al*., 869 N.Y.S.2d 465 (1st Dep't 2008).

New York courts also regularly enforce covenants preventing employees from diverting co-workers to a competing firm. *See, e.g., Veraldi v. American Analytical Laboratories*, 706 N.Y.S.2d 158, 160 (2nd Dep't 2000) (prohibition against soliciting employees "does not violate public policy and, therefore, is enforceable."). Courts also routinely uphold provisions prohibiting the solicitation of clients. *See Merrill Lynch v. Rahn*, 73 F. Supp. 2d 425, 429 (S.D.N.Y. 1999) (granting preliminary injunction, enforcing provision barring solicitation of clients, and noting that the similar relief requested here is "consistently granted").

Whitehead's "non-solicitation of employees" covenant lasts only 6 months, and his covenant not to solicit MSSB clients is even shorter – 90 days. (Exhibit "A" to the Complaint, paragraphs B, C). These covenants, like Whitehead's other covenants, are eminently reasonable. *See also Smith Barney v. Robinson*, 12 F.3d 515, 519 (5th Cir. 1994) (in enforcing one year non-solicitation of employees provision, the Fifth Circuit emphasized: "Robinson is free to recruit stockbrokers or employees for Morgan Keegan - - anywhere, any time, and from any

organization - - save only that small class comprising Smith Barney's employees, a class which he willingly agreed not to solicit.").

In sum, MSSB provided all of the valuable consideration under the Agreement, and Whitehead accepted all of this valuable consideration. MSSB upheld all of its obligations. Whitehead must honor his obligations as well.

**2. MSSB Will Suffer Irreparable Harm**

MSSB will suffer irreparable harm unless the Court grants injunctive relief. In his Agreement, Whitehead expressly agreed that damages would be an inadequate remedy should he fail to comply or threaten not to comply with his notice, non-solicit, or other covenants.

New York courts have placed great weight on these injunctive consent provisions. As the Second Circuit emphasized in *Ticor Title Insurance Company v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999): "In fact, the employment contract sought to be enforced concedes that in the event of Cohen's breach of the post-employment competition provision, Ticor shall be entitled to injunctive relief, because it would cause irreparable injury." *See also IBM v. Papermaster*, 2008 U.S. Dist. LEXIS 95516 at *29 (S.D.N.Y. November 21, 2008) (court noted that "Mr. Papermaster has acknowledged that IBM would suffer 'irreparable harm' if he violated the Noncompetition Agreement. . ."); *Estee Lauder Cos. v. Batra*, 430 F. Supp.2d 158, 174 (S.D.N.Y. 2006) ("Additionally, as in *Ticor*, the employment agreement between Batra and Estee Lauder concedes that in the event of breach of the post-employment competition provision, Estee Lauder shall be entitled to injunctive relief because it would cause irreparable injury.").

Even in the absence of Whitehead's express consent to a TRO and a preliminary injunction, New York law is clear that MSSB will suffer irreparable harm if Whitehead violates his covenants. *See, e.g.*, *Ticor*, 173 F.3d at 69-70; *IBM v. Papermaster*, 2008 U.S. Dist. LEXIS 95516 at *40.

As a former high-level Morgan Stanley manager responsible for over 100 financial advisors, Whitehead is uniquely positioned to inflict irreparable harm on MSSB if he violates his notice, non-solicit and other covenants. Under New York law, and the explicit injunctive consent provision in Whitehead's Agreement, MSSB clearly will suffer irreparable harm unless the Court grants injunctive relief.

**3. The Equities Tilt Decidedly In Morgan Stanley's Favor**

Lastly, the equities clearly tilt in MSSB's favor. In *IBM v. Papermaster*, the court emphasized that "IBM's need to protect its legitimate business interests substantially outweighs the harm resulting to Mr. Papermaster from temporarily not working for Apple, and, as a result, the balance of hardship tips decidedly in IBM's favor." 2008 U.S. Dist. LEXIS 95516 at *44. MSSB's very modest 60 day notice requirement, where it continues to pay Whitehead, is very reasonable to protect its interest in providing for a smooth transition of the multiple MSSB offices in which Whitehead formerly supervised.

Moreover, once Whitehead has satisfied his 60 day notice requirement, there is absolutely no restriction on him working at Wells Fargo in any capacity. He is only prohibited from (i) hiring or soliciting for hire MSSB employees for six months; and (ii) soliciting MSSB clients for a period of 90 days.

The equities tip decidedly in MSSB's favor. Accordingly, MSSB respectfully requests that the Court grant temporary injunctive relief to ensure that Whitehead honors his straightforward and very reasonable covenants, and to prevent irreparable harm to MSSB.

## CONCLUSION

For all of the foregoing reasons, MSSB respectfully requests that the Court grant its motion for a temporary restraining order and preliminary injunction pending an expedited arbitration in accordance with FINRA Code Rule 13804.

Dated: March 31, 2010

GEHRING & SATRIALE LLC

By: /s/

Joseph E. Gehring, Jr. (JG8178)
370 Lexington Avenue, Suite 1200
New York, New York 10017
(212) 400-7420
(212) 400-7440 (fax)

COSS & MOMJIAN, LLP
111 Presidential Boulevard, Suite 233
Bala Cynwyd, PA 19004
610-667-6800
610-667-6620 (fax)

Attorneys for Plaintiff

**EXHIBIT A**



## Order on Request for Permanent Injunction

At the conclusion of a hearing on a request for permanent injunction under FINRA rules[1], please complete this form.

**An in-person or telephonic hearing on a request for Permanent Injunction under FINRA rules was held in the matter of:**

CLAIMANT(S): AllianceBernstein LP

RESPONDENT(S): Riyand Said & Wells Fargo Advisors

CASE #: 10-00758

The hearing was held on March 3 2010 (month/date/year).
The follow individuals participated in the hearing: [list the attending individuals]

Chairperson: Peter Pokorny

Panelist: Ezio Borchini

Panelist: Dolono Coutts

Claimant's Representative: Christopher Coss / Albert Martinez

#1 Respondent's Representative: Thomas Lewis

#2 Respondent's Representative: ~~Thomas Lewis~~

FINRA Dispute Resolution Staff: ______

At the hearing for permanent injunction, the following occurred:

1. Respondent ______ filed its answer to the statement of claim.

2. Respondent ______ filed its answer to the statement of claim.

3. The parties accepted the panel's composition. (If not, please explain.) Yes.

[1] Industry Code: Rule 13804; Old Code: Rule 10335

4. In determining the request for permanent injunction, the panel used the following legal standard (Select one):
   (a) Choice of law as indicated in the parties' agreement; or,
   b. The law of state where events occurred if there is no agreement.

5. On Claimant Alliance Bernstein's request for permanent injunction, the panel rules as follows (circle and complete all selections that apply):
   a. Granted In Part – TRO to be continued/extended until next hearing on this matter.
   b. Denied
   c. The permanent injunction filed by ______ shall become effective:
      i. Upon the expiration of the TRO used by the Court on (month/date/year) ______ and expire on ______
      ii. Immediately and will expire on (month/date/year) ______

6. On Respondent ______'s request for permanent injunction, the panel rules as follows (circle and complete all selections that apply):
   a. Granted
   b. Denied
   c. The permanent injunction filed by ______ shall become effective:
      i. Upon the expiration of the TRO used by the Court on (month/date/year) ______ and expire on ______
      ii. Immediately and will expire on (month/date/year) ______

7. The parties are prohibited from seeking an extension of the court's order.
   Yes or No

8. The parties are directed to jointly move the court to modify or dissolve the court order. The parties shall file this motion within ______ days from the date of this order.

"Up To" 60-day Notice Period described in Contract dated 8/20/07 #7 to run from date of this award. The U-5 of Respondent shall not be amended by Claimant to reflect Termination but will read "Voluntary." Respondent to be compensated/benefits as provided under contract."

9. The panel has scheduled additional hearings to resolve damages and other issues as follows:

   a. The next scheduled hearing session will be held on (month/date/year) ____________________ at ____________ (time). The following dates have also been reserved for this hearing:
   ____________________
   ____________________
   ____________________

   b. The arbitrators and parties have tentatively reserved (month/date/year) ____________________ at ____________ (time) for a Pre-hearing conference to resolve ____________________
   ____________________
   ____________________
   ____________________

   c. The Chairperson and parties have tentatively reserved ____________ (month/day/year) at ________ (time) for a Pre-hearing conference to resolve the following discovery matters:
   ____________________
   ____________________
   ____________________

   d. If Pre-hearing briefs are filed, they must be filed by: ____________________

   Response filed by: ____________________

   Reply filed by: ____________________

   e. If motions are filed, they must be filed by: ____________________

   Response filed by: ____________________

   Reply filed by: ____________________

10. Other rulings (i.e., arbitration fees, extra fees to be deposited, etc.):

   a. The parties are liable for the increased arbitrator honoraria on the hearing for the permanent injunction as follows: Claimant hereby ordered to provide accurate information on Respondent upon request by customers; and shall make no misrepresentations about Respondent

   b. The parties are liable for the reasonable travel expenses of arbitrator, ________ ____________________, who traveled outside his or her

Respondent shall provide a "Certificate" as required under Par. 3C indicating the Return or destruction of all confidential items of Claimant.

assigned hearing location as follows:
Claimant #1 is assessed ______________________

Claimant #2 is assessed ______________________

Respondent #1 is assessed ______________________

Respondent #2 is assessed ______________________

Respondent #3 is assessed ______________________

11. If the parties settle this matter with no further hearings:

a. The cost of this permanent injunction hearing and any other hearing, including initial Pre-hearing conference or Pre-hearing conference, will be borne as follows:
Claimant #1 is assessed 50%

Claimant #2 is assessed ~~[illegible]~~

Respondent #1 is assessed 50%

Respondent #2 is assessed ______________________

Respondent #3 is assessed ______________________

b. Is this preliminary assessment joint and several? Yes or No

c. If this preliminary assessment is joint and several, state below the parties against whom it is made (circle all that applies):
i. Claimants only
ii. Respondents only
iii. Claimants and Respondents

______________________
______________________
______________________

NOTE: FINRA rules[2] provide that chairperson shall receive $375.00 for a single session and $700 for each double session on the permanent injunction, while panelists shall receive $300 for each single session and $600 for each double session. The Rule provides that the parties shall equally pay the difference between regular and the injunctive relief honorarium[3] and that the arbitrators may reallocate this additional

[2] Industry Code: Rule 13804(b)(6)(c); Old Code: Rule 10335(b)(6)(c)
[3] Industry Code: Rules 13214 and 13804(b)(6)(c)

amount among the parties in the award. ***This increased honorarium applies only to hearings for permanent injunction and does not apply to Pre-hearing conferences or additional hearings on damages or other issues.***

FINRA rules[4] provides that the parties shall jointly bear an arbitrator's reasonable travel-related costs and expenses for required travel to a hearing location other than the arbitrator's primary hearing location(s). The arbitrator may reallocate such costs and expenses among the parties in the award.

If a member firm fails to satisfy an invoice, FINRA Dispute Resolution will debit the member firm's CRD account.

This order will remain in effect unless amended by the arbitration panel.

Dated: 3/2/10

PETER PORMANY

Chairperson's Name and Signature

Ezio Borchini 03/03/2010

Panelist's Name and Signature

Dolores A Coutts

Panelist's Name and Signature

[4] Industry Code: Rule 13804(b)(6)(A); Old Code: Rule 10335(b)(6)(A)